Arguments not to exceed 15 minutes per side. Mr. Forge, for the appellant, you may proceed. Your Honor, may it please the Court, I would request five minutes of my 15 minutes for rebuttal. If I may proceed, Your Honor, may it please the Court, opposing counsel. This is a case brought under Title VII of the Civil Rights Act of 1964 and corresponding to state law, alleging race discrimination. More specifically, it's an appeal from a grant of summary judgment in favor of the defendant, Duke Energy. This Court reviews de novo, and you would proceed along the lines of the McDonnell-Douglas-Berline analysis. It's well known to the Court. There's no issue either at the trial court or on appeal of what... You have no direct evidence of racial discrimination? No, Your Honor. We proceeded on the... All we have is a McDonnell-Douglas. That's correct, Your Honor. That's the way the plaintiff proceeded, both at the trial and here. There's no question that we established a prima facie case. The Court did not deny that, and there's no issue of whether the defendant came forward with legitimate non-discriminatory reason. The issue here, in the state court and on appeal, is whether the plaintiff has proven pretext. Now, under long-standing case law in this Court, there are three ways of proving pretext. These were set forth in the Mansard decision in 1994. The proffered reason has no basis in fact. The proffered reason did not motivate the action in question, in this case, my client's termination. Or that the proffered reason was insufficient to motivate that action. Now, we are proceeding under the third prong here. We assert that the reason given is insufficient to motivate the termination. The case law that has developed this prong indicates that the standard is you look to similarly situated employees. Now, did your client say that he was in the management, or did Duke Power say he was in management, or both agree on that? Well, Your Honor, I think that our contention is yes, he is a management position. In the context of the facts of this case, this simply means that he's not a union employee. No supervisory functions. And this goes into the next part of my argument. The defendant, both in the proscenius below and on appeal, has argued that my client has not demonstrated that there is anybody who is similarly situated in all respects. That's the standard that was set forth by this Court in Mitchell v. Toledo Hospital in 1992. The trial court adopted that same one and determined that my client had not shown that anyone who was another management employee was similarly situated in dismissing the case. Are you disagreeing with that conclusion? Yes, I'm disagreeing both with the legal standard and with the conclusion, Your Honor. Now, as far as the legal standard is concerned, in 1998 this Court considered the case of what was meant by the term similarly situated. In that one, they criticized the Mitchell holding. They held while the standards set forth in Mitchell might be relevant in certain circumstances, you have to make a case-by-case analysis and you must determine what the factors would make another employee similarly situated in the context of the individual case, or as they say it, in the relevant aspects. Was Mitchell a Sixth Circuit case too? Mitchell was a Sixth Circuit case, Your Honor. Okay. I'm sorry. One panel, a subsequent panel of this Court cannot overrule a previous decision of this Court. They did not overrule, Your Honor, but they criticized the decision. They can criticize it. Okay. But if the first case, if Mitchell establishes a rule of law, that rule of law applies to us, all Sixth Circuit judges, until it's overruled by the Supreme Court or by our en banc court. Well, Your Honor, I think your second point is… Is that not true? Well, Your Honor, that is true, but that is not the exact context in which Urszagiewicz was. What Urszagiewicz said was that, and what Mitchell did is they set forth standards that said they have to have the same supervisor, they have to have the same work rules, other criteria. Urszagiewicz said that's not what the case that Mitchell was relying on meant. Those standards are still… I mean, if that's dicta in Mitchell, it doesn't have to be filed, but if that's the holding in Mitchell, I think it doesn't. Your Honor, the holding in Urszagiewicz is that the Mitchell factors are not… This Court, the Sixth Circuit never intended Mitchell to be so narrowly construed. The factors that were set forth in Mitchell are the relevant factors in the Mitchell case, but in the broader picture, you would only look at the factors that are relevant in the context of the individual case. Let's move on. Okay. What's the point you want to make now? Okay. Well, Your Honor, what I'm saying is the trial court should have looked and found what standards were relevant in the aspects of the case. Here what we have is we have an investigation into an altercation at work. My client was the only management employee, that is, non-union employee, who testified before that committee. Applying the strict standard that he would have to be situated in all respects, as set forth in Mitchell, would preclude him from ever having any comparable persons or ever be able to prove his case. Why is that? I mean… Because none of the other employees who testified were management employees. Normally, when we look at similarly situated employees, we don't limit it to the incident in question. We go back. This company has been in business 50 years. Has there ever been an incident somewhat like this before? And if so, how were similarly situated people treated? So if 10 years ago you had a white management employee that witnessed a fight like this, and he was not discharged, and that's a similarly situated person, similar incident, this and that, that's normally how we look at these cases. We don't normally limit it for the incident in question, but we say, what has happened before? And if it happened before, and the plaintiff in this case, who is African American, is terminated, but five years ago the Caucasian was not, there is an inference that race played a factor there, and that's how you get through McDonnell Douglas to create circumstantial evidence. Your Honor, in this case, my client was terminated for violating the code of ethics, the harassment policy, and workplace safety. Have there been Caucasian management people before that basically did the same thing that were not? No, no other person was ever terminated. All right, without direct evidence, and then without circumstantial evidence of similarly situated people, how do you have a case here? Your Honor, that's the exact reasoning in Ercegovich. That's why they said you can't just say this person doesn't have a case. You have to look at the relevant aspects. Here the relevant aspects are their comportment in front of the investigatory committee, and it doesn't matter for that whether they're a management employee or whether they're a union employee because they're held to the same standards. Is there a collective bargaining agreement that gives the union employees rights that the management employees don't have? No, not in this context. Okay, first of all, is there a collective bargaining agreement? Yes, there is, Your Honor. And does that give union employees rights for discipline or discharge in general? Your Honor, that wasn't an issue. The question was whether there was. You can answer by question, though, does it? I would assume that there is. You don't know? I don't know. I don't know of too many collective bargaining agreements that don't. Right, I know. Okay, management employees usually by definition are at-will employees. Do you have any, is there any evidence that these management employees for Duke Energy were not at-will employees? Your Honor, I don't, this was never an issue that came up below, so I can't definitively say. I would assume that. You have no evidence to the contrary. Well, I would assume that the collective bargaining agreement has some step procedure or a grievance procedure in it. My client was an employment at-will. But the issue here and the way they were determined is not under, he wasn't, he was terminated for violating a policy that, even under the collective bargaining agreement, applies to all the employees, union and non-union. And their conduct in front of the investigatory committee is what's at issue, and that's what's relevant. And that's where there are issues in fact. Excuse me, are you admitting that there were no similarly situated employees? We have not been able to. Is that a different theory, or are you saying that somebody was a similar situated employee? No, we're not admitting there were no similarly situated employees. We think that other Caucasian employees that participated in this investigation are similarly situated. Okay, so you're saying the union people are similarly situated. Yes, sir. The lower level people. But how can the union people be similarly situated with a management person when the, well, first of all, when the union people have additional rights that may prevent their termination, and two, while management people, I mean, just, they're expected to do more than union people. Union people have menial jobs to do, not a lot of discretion or whatever, but management people are expected to exercise discretion, exercise judgment. I mean, there's a huge distinction between union, management, and you're saying we're going to treat these as if they're all the same. I think, Your Honor, that you're following the path that the trial court did, and we challenge that because what we say is that that distinction is not relevant in this context. What's relevant here is whether you testified truthfully in front of the committee and whether you withheld evidence. I would put my management people at a higher standard than my union hourly people and expect more from my management people. That's how they got up to management, for one thing. They went up the ladder of the company because, guess what, they did a better job, but I also expect better conduct from them, better ethics, better this or that, and therefore to compare the same, I'm not sure, fine, that's all. Let me ask you this. On the issue of whether your client was a management person and whether there were factual disputes as to that, when you said that your client was a member of management because he's not in the union, is that your chief criterion for your assertion that he's not management? In other words, if your client had that title, so to speak, but had no management responsibility in training, then perhaps he was not a management person for purposes of our analysis, even though he was not a union employee. Now, that might be your position, or maybe your position is that he actually was a management employee. What is your position on that? Your Honor, I think the key here is the way management has been used by the trial court and by the defense is supervising. He doesn't supervise any employees. He doesn't exercise any authority. He just orders parts and schedules their arrangement in it and schedules planning that is performed and overseen by other people. So he does not exercise the discretion and responsibility of a management person. That's what you're saying. Is that right? Right. He's just not a member of the union. Okay. All right. I got you. I'm sorry, Your Honor. My time has ended. Yeah. Your time is over. May it please the Court, Counsel James McLean, in-house counsel for Duke Energy. I think the judges are in tune to what the primary issue is in this case. Mr. White attempts to show pretext, arguing that the reason for his termination was insufficient and that others were treated more favorably for similar conduct. And I think to put this whole management question in perspective, if you look at what Mr. White did once he witnessed this incident to show you why we expect more from our management employees and how he reacted differently than a union or hourly employee, he spoke right after this incident, spoke to each of these participants. In effect, he interviewed them, talked to them separately. Who are you talking about? I apologize. It was Duane Doyle and Daryl Doody, the two participants in this incident. Talked to one out in the parking lot, asked him what happened, went inside, spoke to the other. You're talking about Mr. White did this? Correct. That's correct. Mr. White talked to the people ahead of the fight. Correct. And I get those, Daryl Doody, Duane Doyle, I get those confused. But, yeah, Mr. White went and spoke to both of them right after this happened, which was invaluable information. Spoke to them closely in time to this incident. Got each of their sides of the story. Found out that there was a physical altercation. One told him he was injured. Saw evidence of injury to the other. That's something Mr. White was supposed to do as part of his duties or he'd just do it on his own? Well, I'm not saying that it's part of Mr. White's work description that he would do that, but that's what you would expect of a management employee at Duke Energy who would witness such an incident, exactly what he did. Went and spoke with each of them. Got information. Unfortunately, the disappointing part is that Mr. White chose not to do anything with that information. What was even more disappointing was for him to show up at his initial fact-finding interview and withhold that information. Did he also agree to keep it quiet? Didn't he agree to cover it up? There were discussions, and unfortunately, Mr. White did agree to that and did follow through with that. Sat in the meeting, was asked if he had any other information that was important to this incident. Did one of the participants in the fight ask him to keep it quiet, and didn't White agree to keep it quiet or something like that? There were discussions, and there was an email that was sent. I think Mr. White denied that he actually read the email, but judging from what Mr. Okay, that might be an issue of fact of whether he agreed to keep it quiet. Certainly his actions would demonstrate that he certainly not only did he agree to keep it quiet, he in fact did keep it quiet. His initial statement was not full or complete. It omitted several crucial facts that he knew, and then he went back to try to correct it. And to Mr. White's credit, he did admit that. He tried to correct it. He did admit that, and then the second time he was called in on the carpet, he tried to offer information that he should have. Okay, is the key that White is an at-will employee, and you expect your management to have the best behavior, whether it's written down somewhere or not, and they're subject to be fired at will. And if you want to establish racial discrimination, if you don't have direct evidence of it, you've got to have circumstantial with a civilly-situated person, and they just don't have it. Well, and the common thread running through this is, you know, this triangle of these two employees, Doody, Doyle, and Mr. White. Well, Mr. Doyle, I think there's criticism that Mr. Doyle was not fired, but Mr. Doyle went into the fact-finding, and he told the truth. Doyle's union, right? That's correct. Mr. Doody, who was also union, went in and behaved as Mr. White did. He withheld information. Mr. Doody was terminated. So the two gentlemen who showed up at their respective fact findings and withheld information from the committee that there was a physical altercation were terminated. One Caucasian, one African-American, treated both the same, despite the fact that one was management. We certainly expect more from management, but, again, the common thread, both withheld information. Well, he really wasn't management. I mean, he didn't supervise anybody. He really didn't have very much in the way of responsibility. He wasn't responsible for training. I don't see any management responsibilities to speak of here. We keep calling him management. If you're bothered by that, I mean, certainly, again, as a work planner, but if you're bothered by that, the fact that, again, looking at the conduct, they're still not similarly situated. These employees that he references went to the fact-finding. One was on vacation the week this happened. He says, hey, all I heard was rumors. I was on vacation that week. There's nothing in the record saying that that was false. The other gentleman came in and said, hey, I heard that it wasn't physical. All I know or what I have is hearsay. Mr. White essentially sat silent after he told what he actually saw when given an opportunity to say, well, hey, here's what I got from the very mouths of these participants. He sat silent. And it's bothersome, was bothersome to the committee. That's why he was terminated. Okay. How about Bill Hyland, who was a maintenance supervisor? Is he similarly situated or not? No. Why not? I don't believe so. First of all, Mr. Hyland, if you look at his conduct, there was an employee who saw Mr. Doyle in the shower and observed bruises, asked him what happened, went and reported that to Mr. Hyland. Mr. Hyland then, as he was supposed to, went and advised Teresa Taylor of HR of this incident. And, again, that's sort of what got the ball rolling. So you're saying he promptly reported it once he had knowledge? Well, you know, there's nothing that says that you have to report it within 10 hours, 24 hours. But once it came to his attention, he took that to Ms. Taylor in HR. And that's one of the options that you have. Either tell a direct supervisor or report the matter to HR. And that's exactly what Mr. Hyland did. Okay. And does he have any other involvement in this thing? I mean, is there any other? No. Mr. Hyland, I believe he was questioned. Mr. Hyland, everyone besides Mr. Doody and Mr. White were truthful, and no one else was disciplined, just the two individuals that were not truthful in the fact-finding. Was Doody terminated, did you say? Yes. Doody is Caucasian. If the court should have looked at these, Doody and Doyle as similarly situated, would the result be the same? Well, I think Doyle, and I think on a good Duke Energy, an honest belief found that Mr. Doyle was not the aggressor, that it was, in fact, Mr. Doody who was the aggressor in this instance. Mr. Doyle also came to the fact-finding and was truthful, unlike Mr. White and unlike Mr. Doody. And I don't believe, in that instance, that their conduct certainly was not similar. There's nobody else involved who might have been similarly situated from a prior incident or anything like that? No. No. Thank you. So we would ask that the court affirm the grant of summary judgment dismissing plaintiff's federal and state claims. Mr. White did not prove pretext. The employees that he refers to are not similarly situated to Mr. White. Aside from the fact whether or not Mr. White was a management employee, his conduct was much different from these other alleged comparators that Mr. White wants to talk about in this case. Unless the panel has any further questions? No. Thank you. Your Honor, I'd like to address several of these factual issues that came up in the discussion with opposing counsel. First of all, Mr. Doyle did attempt to contact my client. I think he wanted him to work out some deal with Doody where they wouldn't turn anything in. My client was not involved in that. He talked to Mr. Doyle when Mr. Doyle approached him, and I think that was the only involvement. He didn't try to cover anything up. With regards to Mr. Hyland, I think it's... Okay. What was his involvement with his attempt to cover up? I think that Mr. Doyle wanted him to act as an intermediary to cover it up. Did Mr. Doyle personally talk to him about it? Mr. Doyle talked to him... He sent him an e-mail, and then he talked with him. My client deleted the... Okay, so he may or may not have seen the e-mail, but how about did Doyle talk to him and say, Will you cover this up? No, he didn't say that. He was much more oblique, but he essentially wanted him to approach Mr. Doody to make sure everything was okay, and, of course, he didn't do that. He just left it at that. Okay, so he didn't respond to the request. Right, right. Okay, now, as far as Mr. Hyland is concerned, we had this incident on Monday, the 28th, which would have been the weekend after this incident, where another employee, Mark House, sees the bruises and goes to Mr. Hyland and reports that. Now, we know that that happened on the 28th or the 29th because it's referenced in the note that Doyle left on Daryl Doody's windshield, which occurred either on the 29th or the 30th, according to that testimony. So Mr. Hyland knew about this at the earliest on the 28th, but at least by the 29th. He did not, according to Teresa Taylor, who was conducting the investigation, after they did the first rounds of testimony on the morning of December 7th, Mr. Hyland came forward and claimed that he had just learned of additional evidence which was related to him by Mr. House. So either this employee named House sat on it for seven days or Mr. Hyland sat on it for seven days. In either case, some employee knew about this incident and did not come forward for seven days. One of the allegations and one of the criticisms of my client is he knew about the— he had direct evidence after talking with Mr. Doyle and Mr. Doody on the date of the incident, and by the way, they both gave conflicting accounts, he didn't come forward. What he actually did is that interviews occurred after 5 o'clock on the Wednesday before Thanksgiving. He walked around and checked to see if there were any supervisors. There were no supervisors, so he went home. When he returned to work, he was off that Monday, on Tuesday, he made inquiries among his coworkers who told him that management was aware of the situation and was investigating it. So he didn't go any further because he thought anything he could tell them had already occurred. Counsel, isn't your strongest argument that Mr. Doyle, in addition to Mr. White, Mr. Doyle also did not report the incident and that if there's a disputed issue of fact as to whether Mr. White as a management employee, he and Mr. Doyle were somewhat rather comparably situated, and furthermore that when Mr. White was terminated, he was replaced by a white employee for purposes of establishing a prima facie case and that there were disputed issues of fact regarding all of these matters, which is why summary judgment may have been improvidently granted. In a nutshell, isn't that your argument, your strong argument here? I think you've hit the nail on the head, Your Honor, and I would only add to that that when Mr. White requested an investigation from the corporate offices of Duke Energy and there was an outside investigator who came in from Charlotte, she reached the same conclusion. She questioned why Mr. Doyle was not terminated also. Did you, did the parties here make any effort to settle this matter or talk to our court's mediation office perhaps about resolving this matter? Your Honor, we went through the mediation office in this court, mandatory mediation in an early stage. We were very far apart at that time. All right. Do you have anything further? Nothing unless there's any other further questions, Your Honor. Okay. Thank you very much. The case is submitted.